Argued and submitted March 13, reversed December 24, 2008

Valerie Gay GOODNESS,
*Petitioner-Respondent,*

*v.*

Ricky Don BECKHAM,
*Respondent-Appellant.*

Lane County Circuit Court
180701078; A135111

198 P3d 980

George W. Kelly waived appearance for appellant.

Michael Arnold argued the cause for respondent. With him on the brief was Arnold Law Office, LLC.

Before Wollheim, Presiding Judge, and Armstrong, Judge, and Sercombe, Judge.

ARMSTRONG, J.

.

## ARMSTRONG, J.

Respondent appeals from a judgment granting petitioner's requested permanent stalking protective order (SPO).[1] On appeal, respondent challenges the sufficiency of the evidence to support the order and the award of attorney fees to petitioner. We review the facts *de novo, Hanzo v. deParrie*, 152 Or App 525, 537, 935 P2d 1130 (1998), and conclude that the record does not contain evidence of two or more contacts that meet the requirements for entry of an SPO. We therefore reverse.

Petitioner has known respondent for 15 years. They were formerly married to each other and have a son, "C." During their marriage, respondent physically abused petitioner a number of times. He also damaged property in the home and had altercations with petitioner's older children, who lived in the home. During that time, respondent threatened to kill petitioner and was arrested after grabbing her by the throat and punching her in the face. Petitioner obtained at least two restraining orders against respondent. The last instance of physical abuse took place in 1998 or 1999, after which respondent was removed from the couple's home by the police.

The parties dissolved their marriage in 2002. Pursuant to the dissolution judgment, petitioner has sole custody of C and respondent has parenting rights. Among other rights, respondent has the right to receive C's school records, to consult with any person who provides care or treatment for C, and to have supervised parenting visits. Additionally, the parenting plan provides that respondent shall have telephonic parenting time with C twice per month, that petitioner must provide respondent with a telephone number at which he can call C, and that respondent and petitioner shall

---

[1] On appeal, we refer to the parties as designated in the trial court. ORAP 5.15.

"In civil stalking proceedings, the party applying for relief is denominated the 'petitioner' and the party against whom the relief is sought is the 'respondent.' Obviously that nomenclature can be confusing in an appeal like this, where the 'respondent' below is the appellant and the 'petitioner' is the respondent."

*Hanzo v. deParrie*, 152 Or App 525, 527 n 1, 953 P2d 1130 (1998).

provide one another with their home addresses and phone numbers.

C, who is now 13 years old, is autistic and has behavioral and mental health problems. According to petitioner, C would "go into meltdown" whenever respondent called. Petitioner testified that, "[f]or the safety of my son, I chose not to allow phone contact [with respondent] and that is due to conversations with his counselors, his teachers, his doctors, his med doctor, his psychiatrist." One of C's therapists testified that,

> "whenever there was contact between [C] and his [f]ather, [C] experienced these post[-]traumatic stress disorder symptoms and behaviors * * * as a result of repeatedly witnessing the domestic violence, which was significant, against his [m]other and that * * * by report, [C] was sexually abused by his two paternal uncles when he was visiting with his [f]ather[.]"

In May 2005, petitioner's attorney sent a letter to respondent, explaining that petitioner was not willing to allow telephone contact between respondent and C or to provide respondent with contact information because it was not in C's best interests.

In fall 2005, respondent came to petitioner's home. According to petitioner, they had agreed to meet at a restaurant so respondent could bring a four-wheeler to one of her sons, but, instead, respondent showed up at her home, which alarmed her. Respondent describes the event differently:

> "I did come up here and I did go to her house, * * * that's true. I came up with a quad and a trailer and I brought it to a hotel and called them at that time. They met me there and they looked at the quad and the trailer because I was giving it to her for like a payment for back child support and stuff and she was accepting that. She said, okay, you get to spend some time with [C]. She let me go with him to an animal store, go have some lunch with him. I went to—they brought me to her house, which I had no idea where it was until they brought me there. We talked, I talked to [petitioner] and I talked to [C] and checked out his stuff that he had, his lizard and all that."

Throughout 2006, respondent and petitioner exchanged e-mails. Petitioner testified that the e-mails said things like " 'you fucking whore, you fucking bitch, I'm going to get you back, I'm getting my [s]on, you'll never see him again, you['re] going to pay.['] Mostly 'you['re] going to pay for this.' " Petitioner was frightened by the e-mails, "[b]ecause it's a pattern[; e]very year he's done this[,]," and that twice before, respondent "would come right up [from California] and end up showing up at my house."

In January 2007, petitioner filed a petition for an SPO, and a temporary SPO was granted. Four weeks later, the court conducted a show cause hearing to determine whether to enter a permanent SPO. In her petition, petitioner listed three contacts as the basis for entering an SPO against respondent. The first two are

"1/15/07: [Respondent] called the Eugene Police saying I was molesting and harming our son. [Eugene Police] came to my home to do a safety check.

"1/11/07: CAHOOTS[2] came to my home at the request of [Eugene Police] to do a safety check saying that [respondent] feared for the safety of our child."

Petitioner testified that respondent had previously told her he was going to call the police and tell them that she was abusing C.

There had been no calls between respondent and C for about two years before the filing of this petition. As a result, petitioner testified, C was "thriving," and his behavioral problems had ceased. One of C's therapists testified about the effect that the visits from CAHOOTS and the Eugene police had had on C: "[C] had regressed behavior. He exhibited significant post[-]traumatic stress disorder symptoms, paranoia, he was hallucinating and [experiencing] [flashbacks] at school and reportedly at home."

---

2 CAHOOTS (Crisis Assistance Helping Out On The Streets) is a mobile crisis intervention team in Eugene dispatched through 9-1-1 that responds to non-criminal crises, such as intoxication, disorientation, substance abuse and mental illness problems, and other disputes. *See* White Bird Clinic, White Bird Cahoots, http://whitebirdclinic.org/cahoots.html (last visited Oct 28, 2008).

The third contact listed by petitioner in her SPO petition was "12/19/06: I blocked [respondent's] [e-]mails[.]" In her petition, she also described additional circumstances that caused her to be alarmed by the contacts listed above:

"From 11/29/06 to [12/19/06,] [respondent] sent me 19 pages of e[-]mails of vocabulary that has been a pattern of several years indicating extreme [escalation], which places me in great fear of abuse and death by him to myself or my child. He starts with delusions that the doctors, counselors, and courts are in a conspiracy[.] He then den[ies] the court order, then claims it was 'I' who committed the crimes in the past, not himself. By this time he uses name calling towards me that is very abusive and threat[e]ning. It is during this time in the past (›2 years ago) that he has shown up and hurt me, caused SEVERE Emotional Trauma PTSD to our son.

"* * * Last year around Christmas time [respondent] did the SAME thing, threatening me, placing me in [e]xtreme fear for my safety.

"1/25/06 to 1/27/06 [Respondent] [e-]mailed me [l]ast year threatening to '[g]et me back'[,] 'to [p]ay me back'[,] calling me a [f]ucking [b]itch, a fucking whore, that he can come and see my son at my home[, t]o give him my [f]ucking phone number and address[, t]hat I was a fucking liar[, a]nd that he will get C from me no matter what it takes."

Petitioner attached four pages of e-mail excerpts to her petition, which contain the following statements by respondent:[3]

"[Y]ou['re] psycho and if I didn[']t have [to] talk [to] you that would be fine with me I want to talk to C that[']s all[.]

"Valerie why is [C] [masterbating] in his classro[om] you bitch you['re] telling everyone I did it or my brothers you['re] going [to] hell Valerie * * * face the facts you know dam[n] well why he is like he is and giving drugs I hope you got lots of money miss high and mighty you are going to need it and hope[fully] I CAN GET YOU WHERE NEED BE BEHIND BARS * * *.

---

[3] Petitioner attached pages 3, 5, 7, and 8 of a 14-page printout of mostly undated e-mails, which were exchanged sometime between 11/30/06, which is the date of the last e-mail, and 1/16/07, which is the date that they were printed. It is unclear from the record, but we assume that those are some of the 19 pages of e-mails discussed in the petition.

"You have not given me any address in which to send [C's] gift or correspond[ence] from you or your attorney nor have you [given me an] address where my son lives nor a phone number to contact him concerning his welfare. Valerie please keep your childish opinions to your[ ]self they don[']t have any[ ]thing [to do] with me talking to my son or trying to get a[n] address from you as you are directed to do by the courts. Also Valerie it['s] not harassment to contact you concerning my son and his welfare which I have a problem with you. You don[']t have his best interest at heart otherwise you have let me talk to him. [A]re you not trying to hide something it sure seem[s] that you are. As I told you before all I want to do is talk to my son as courts order I[']m concerned about his welfare at this point because if for no another reason you[']re] hiding something o[r] something's going on in your house that will hurt him. [Y]ou[']re] not letting talk or write or letting me have father son relationship as the court order[ed] you. [Y]ou have no good or any founded reason to keep him from talking to me so I[']m asking you again please let me talk to my son Valerie."

Regarding those e-mails, respondent testified:

"She has these e-mails stating supposedly that I was abusive and basically the e-mails are because I'm concerned for my [s]on. * * *

"As far as the things that are happening in his life, the mental health issues and things, there is a parenting order that says she's supposed to give me all that information, that I'm supposed to be in contact with these people that are addressing the issues. * * * That's part of his welfare, I believe that. C needs to know that I care about him. I love him, I miss him. If he's having meltdowns or whatever, I never hear about it * * *.

"I try to talk to [petitioner] and you know, all she does is come back to me with 'you[']re] harassing me, don't talk to me.' 'Well, what's going on with C?' 'That's none of your freaking business, don't even ask.' It's in the e-mails. As far as an address or phone number, I haven't had any of that. That's the reason for e-mail contact, that's all I have. I didn't have a phone number, I didn't have an address.* * *

"She wouldn't let me talk to C * * *. She refused to let me talk to him. She refused to give me an address because she had moved from the previous address where she lived

before. She refused to tell me anything and then all of a sudden he's having all these problems and everything and I'm not saying that C's not having problems you know what I mean. I want to know about them. I want to talk to the counselors and the people that are involved in his life[.]
* * *

"All I want to do is know how he's doing, you know. But as far as the Stalking Order, I've never told [petitioner] or threatened her in any way that I was going to kill her or anything like that. The only reason why she's bringing up the Stalking Order is when I wrote those e-mails, she said 'this is harassment.' I said it's not harassment if I'm asking you how my [s]on is doing, to try to find out what's wrong with my [s]on. * * * So, basically, as far as [petitioner] goes, I think that—I know she loves C, and I love C, but there's got to be a better solution than just saying 'you can't talk to him anymore[,] I'm not going to give you his school records, I'm not going to let you talk to his counselors.'

"* * * * *

"I don't agree with what [petitioner's attorney] said as far as imminent danger because I have no idea where she lives and no idea of what her phone number was. The only contact that I had was through the e-mail and I agree with that. * * * But, the reason for the e-mails again was not to threaten her or anything it was just to try to find out where my [s]on was and what's going on with him. I would rather—if there was an option here where I wouldn't have to talk to her and talk to somebody else and find out how my [s]on is doing, I would much rather do that because it starts getting into these things where she starts calling me names and we start getting into an argument and you know I don't want to argue with her, I don't want to fight. All I want to do is know how my [s]on is doing and that's what it boils down to.

"I wouldn't ever do anything to C's [m]other. I know that he loves her and that she cares about him. I don't know what the answer is to the problem but we are going to file in Clatsop County in regards to the Court Order there because she did not keep her side of the agreement."

At the conclusion of the show cause hearing, the court granted a permanent SPO prohibiting respondent from

having any contact with petitioner or C. The court also awarded petitioner attorney fees.

On appeal, respondent raises two assignments of error. First, he argues that the trial court erred in issuing the SPO because the record does not contain evidence of two or more contacts within two years of the filing of the SPO petition that meet the requirements for issuance of an SPO. Second, he challenges the court's award of attorney fees because petitioner cited the wrong statute under which she sought attorney fees and thus did not comply with ORCP 68 C(2)(a), which requires a party to allege the statutory basis for such an award. Because we agree with respondent's first assignment of error and reverse, we need not consider respondent's second assignment of error.

■ ORS 30.866(1) provides, in part, that a court may issue an SPO against another person if a petitioner establishes, by a preponderance of evidence, that

"(a) The person intentionally, knowingly or recklessly engages in *repeated and unwanted contact* with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

(Emphasis added.)

As we have explained, ORS 30.866(1) has both subjective and objective components. Subjectively, the person who is contacted "must in fact be alarmed or coerced by the contact, and the contact must in fact cause the person apprehension regarding his or her personal safety." *Weatherly v. Wilkie*, 169 Or App 257, 259, 8 P3d 251 (2000). Objectively, the "person's alarm or coercion must be objectively reasonable * * * [and] the apprehension regarding the contacted person's personal safety must be reasonable." *Id.* (internal quotation marks omitted). Additionally, ORS 30.866(1)

requires proof of repeated and unwanted contact by respondent. "Repeated" contact means two or more contacts within the previous two years. ORS 163.730(7). "Contact" is defined, in part, as

"(a)   Coming into the visual or physical presence of the other person;

"* * * * *

"(d)   Sending or making written or electronic communications in any form to the other person;

"(e)   Speaking with the other person by any means;

"(f)   Communicating with the other person through a third person;

"(g)   Committing a crime against the other person[.]"

ORS 163.730(3).

■■   The contacts described in ORS 163.730(3) can be divided between expressive and nonexpressive contacts. Expressive contacts are those that involve speech, such as those contacts described in paragraphs (d) and (e) as "[s]ending or making written or electronic communications in any form to the other person" or "[s]peaking with the other person by any means." If the contact involves speech, in addition to the three elements listed in ORS 30.866(1), Article I, section 8, of the Oregon Constitution requires proof that the contact constitutes a "threat." A threat "instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts," but " 'exclud[es] the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.' " *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999) (quoting *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985)). On the other hand, nonexpressive contacts, such as those defined in (a) and (g) as "[c]oming into the visual or physical presence of the other person" or "[c]ommitting a crime against the other person," need to satisfy only the less stringent statutory standard set forth in ORS 30.866(1). *Boyd v. Essin*, 170 Or App 509, 514, 12 P3d

1003 (2000) (citing *Delgado v. Souders*, 146 Or App 580, 586, 934 P2d 1132 (1997)).

Respondent contends that the record does not show sufficient contacts to support the trial court's entry of the SPO. In response, petitioner argues that the record contains sufficient evidence of repeated and unwanted contact that satisfies ORS 163.730(3) under several theories.

First, petitioner argues that there is evidence of one physical contact under ORS 163.730(3)(a) that occurred in fall 2005 when respondent came to petitioner's house with a four-wheeler. Petitioner and respondent characterize that event differently. Petitioner claims that respondent showed up at her home instead of meeting her at a restaurant as they had agreed. Respondent claims that petitioner met him at a hotel to look at the four-wheeler and then took him to her home to deliver it. We need not resolve whether the contact involving the four-wheeler met the requirements of the SPO statute, because entry of an SPO must be based on two or more contacts that meet the statutory standard, and, as discussed below, we do not find that there was a second qualifying contact. *See, e.g.*, *Jennings v. Gifford*, 211 Or App 192, 197, 154 P3d 163 (2007) (finding one physical contact that might support entry of an SPO but declining to decide whether it met the statutory standard because a single contact alone would not support issuance of an SPO).

Second, petitioner argues that the record shows evidence of three contacts under ORS 163.730(3)(g) for crimes committed by respondent against petitioner. Petitioner contends that respondent committed the following crimes against her: (1) criminal trespass in the second degree in violation of ORS 164.245 in fall 2005 when he came to petitioner's home with the four-wheeler; (2) initiating a false report in violation of ORS 162.375 when he called the Eugene Police Department on January 11, 2007, to ask it to conduct a child welfare check on C; and (3) initiating a false report in violation of ORS 162.375 when he called the Eugene Police Department on January 15, 2007, to report that he suspected that petitioner had abused C, a claim that petitioner testified was false.

■       None of those contacts constitutes a crime against petitioner under ORS 163.730(3)(g). To begin with, respondent has not been charged with or convicted of any of those crimes; even under our *de novo* standard of review, the record contains insufficient evidence for us to conclude that respondent committed those crimes. Even if we assume, however, that respondent committed a trespass when he went to petitioner's home, that does not count as a second contact, because it is the same contact that petitioner claims qualifies as a physical contact. A single contact cannot become multiple contacts even if it could count as a contact under more than one paragraph of ORS 163.730(3).

■■       As discussed above, 224 Or App at 575, we need not decide whether that contact meets the requisite standard. That is because we are unable to conclude that respondent's two calls to the Eugene police qualify as crimes committed against petitioner. "A person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report[.]" ORS 162.375(1). Even if respondent's two calls requesting a child welfare check and reporting abuse were false reports that violated ORS 162.375, those acts do not qualify as contacts because respondent did not commit those offenses *against petitioner*. The crime of initiating a false report is an offense against public justice; the victim of the crime is the public and not the person implicated in the false report. *See generally State v. Glaspey*, 337 Or 558, 565, 100 P3d 730 (2004) (concluding that the victim of a crime is the person who suffers harm that is an element of the offense); *State v. Allred*, 165 Or App 226, 235-36, 995 P2d 1210 (2000) (Brewer, J., dissenting) (crimes compiled in ORS chapter 162 are offenses against "public justice" and do not require proof of harm to a particular person for conviction). As such, respondent did not commit that offense against petitioner, and respondent's two calls to the Eugene police do not qualify as contacts.

■       Third, petitioner asserts that the visits by Eugene Police Officers and CAHOOTS qualify as nonexpressive (and presumably physical) contacts under an agency theory. Petitioner contends that, because respondent called the police and caused them to come to her home, the physical contact

between the police and petitioner can be imputed to respondent as though respondent himself went to petitioner's home.

The anti-stalking statutes prohibit some third-party contacts, such as "[c]ommunicating with the other person through a third person." ORS 163.730(3)(f). Here, however, the third persons are the Eugene police and CAHOOTS, who were dispatched as a result of respondent's calls to the police reporting his belief that C was endangered. We disagree with petitioner that those visits can be imputed to respondent as prohibited physical contacts. Law enforcement officers responding to a request to conduct a child welfare check are not the kind of third-party actors whose contact with petitioner could constitute a prohibited contact by respondent. Additionally, the police did not go to petitioner's house in order to communicate with petitioner on respondent's behalf. The visits by the Eugene police and CAHOOTS are not contacts under ORS 163.730 by respondent.

Fourth, petitioner argues that there is evidence of several expressive contacts as defined in ORS 163.730(3)(d), contained in three series of e-mail exchanges between petitioner and respondent. Because those contacts involve speech, petitioner must establish that they constitute a threat that "instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *Rangel*, 328 Or at 303 (citing *Moyle*, 299 Or at 703-05).

The first series of e-mails were sent by respondent to petitioner between January 25 and January 27, 2006. As to them, petitioner testified,

"[Respondent] [e-]mailed me * * * threatening to '[g]et me back'[,] 'to [p]ay me back'[,] calling me a [f]ucking [b]itch, a fucking whore, that he can come and see my son at my home[, t]o give him my [f]ucking phone number and address[, t]hat I was a fucking liar[, a]nd that he will get C from me no matter what it takes."

The second series of e-mails were sent throughout 2006. Petitioner testified that those e-mails said things like " 'you fucking whore, you fucking bitch, I'm going to get you back, I'm getting my [s]on, you'll never see him again, you['re]

going to pay.['] Mostly 'you['re] going to pay for this.' " Petitioner testified that she was frightened by those e-mails, "[b]ecause it's a pattern[; e]very year he's done this[,]" and that twice before, respondent "would come right up [from California] and end up showing up at my house." In light of the parties' abusive past, it was objectively reasonable for petitioner to be alarmed by respondent's threats that "I'm going to get you back" and "you['re] going to pay." However, those statements do not unequivocally threaten *violence* and appear to be the "kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee." *Rangel*, 328 Or at 303 (quoting *Moyle*, 299 Or at 705). Additionally, there was no *imminent* threat. At the time of the e-mails, respondent lived in California and apparently did not know petitioner's address. Even though petitioner testified that respondent would come up from California and show up at her home in the past, there is no evidence that respondent intended to follow up the e-mail statements with imminent unlawful acts. Thus, it was not objectively likely that the statements would be followed by unlawful acts.

■ The third series of e-mails were attached to petitioner's SPO petition; the e-mails were exchanged between November 2006 and January 2007. The most threatening statement by respondent in those excerpts is "you['re] going [to] hell Valerie * * * I CAN GET YOU WHERE NEED BE BEHIND BARS[.]" At most, those statements are offensive and threaten legal action against petitioner, but they do not threaten imminent violence and are thus insufficient to support entry of an SPO under *Rangel*. The e-mails are also filled with name-calling and offensive statements, but offensive and demeaning statements are not "an unambiguous and unequivocal threat to cause serious physical injury to the petitioner" and, hence, are insufficient to meet the standard for issuance of an SPO. *Wytcherly v. Lacey*, 220 Or App 225, 226, 185 P3d 530 (2008).

In *Jennings*, 211 Or App 192, we examined a series of repeated telephone calls and text messages in light of the standard articulated in *Rangel*. In that case, the petitioner was alarmed by the respondent's messages that referred to her as a "hypocritical bitch" and told her to "go to hell." There,

we determined that those messages did not meet the *Rangel* standard, because they did not "instill[ ] in petitioner an *objectively reasonable* fear of imminent and serious personal violence." *Id.* at 196 (emphasis added). The same conclusion applies to the e-mails at issue here. Although there certainly is ample evidence of repeated and unwanted expressive contact by respondent that caused petitioner alarm, "the fact remains that there is a complete absence of evidence of an 'unequivocal' threat that instilled in petitioner an objectively reasonable fear of imminent and serious personal violence." *Michieli v. Morgan*, 192 Or App 550, 555, 86 P3d 688 (2004).

Petitioner argues that the statements in the e-mails meet the *Rangel* test when viewed in the context of the parties' history. We have recognized that unwanted contact must be considered in the context of the parties' entire history, and contacts that might appear innocuous when viewed in isolation often take on a different character. *Weatherly*, 169 Or App at 263. Even in that light, the statements at issue here do not meet the *Rangel* standard. In summary, the contacts at issue in this case are legally insufficient to support entry of an SPO. Accordingly, the trial court erred in issuing one. It follows that the award of attorney fees must also be reversed.

Reversed.