Submitted August 7, 2009, affirmed January 6, petition for review dismissed April 15, 2010 (348 Or 218)

Audrey Elizabeth VAN BUSKIRK,
*Petitioner-Respondent,*

*v.*

John Norman RYAN,
*Respondent-Appellant.*

Multnomah County Circuit Court
070302847; A136589

225 P3d 118

John Norman Ryan filed the brief *pro se*.

No appearance for respondent.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

Respondent appeals a permanent stalking protective order (SPO) issued pursuant to ORS 30.866 prohibiting him from having any contact with petitioner. He argues that, because all of his contacts with petitioner were communicative and there is no evidence that he ever threatened her, the order violates his free speech rights under Article I, section 8, of the Oregon Constitution. On *de novo* review, *Osborne v. Fadden*, 225 Or App 431, 433, 201 P3d 278, *rev den*, 346 Or 213 (2009), we affirm.

A detailed recitation of the facts would not be of assistance to the bench or bar. To briefly summarize, petitioner writes for the Portland Tribune. She met respondent once at an open house held by petitioner's employer. Over the next two years, respondent never saw petitioner again, but communicated with her through letters and e-mails, attempting to establish a romantic relationship with her. In many of respondent's correspondences, he told petitioner that, if the contact was inappropriate, "please let me know and I will stop." However, petitioner or those acting on her behalf repeatedly asked respondent to stop attempting to contact her, to no avail.

In his letters, respondent commented on petitioner's articles and on her appearance. He extended invitations to meet for lunch or dinner, shared his project ideas, expressed gratitude for her time and support, and often concluded with such statements as "[w]ishing you a joyful day!" or "[e]njoy the day!" Petitioner has a young son whom she had mentioned in some of her newspaper articles, and the letters also made references to him. The letters reflected that respondent was experiencing irrational and delusional thinking about his relationship with petitioner. In a letter to petitioner's parents, he compared them to Romeo and Juliet. The letters repeatedly referred to people who had been "contaminated" and who were against him and his desire not to expose petitioner to "danger or contamination." Petitioner received a few letters from respondent in 2005, 11 letters from respondent in 2006, and 12 letters in 2007.

Respondent also attempted to contact petitioner by telephone and in person. He called her on her home and work

telephones and left messages for her but never spoke to her, because she screened his calls.

Respondent attempted many times to visit petitioner at work to drop off letters for her. He never succeeded in seeing petitioner at her workplace, because petitioner's coworkers, supervisor, and receptionist intervened; however, respondent's visits were troubling to petitioner and to her coworkers. Respondent began attending public events sponsored by the Tribune or its sister company.

Respondent attempted to contact petitioner through her parents, although he never succeeded in meeting them in person. Petitioner's father had a photography website, and respondent attempted to contact him through that. He wrote letters to petitioner's father, suggesting "business proposals." He went to the parents' house to drop off letters for petitioner.

At the hearing on the permanent SPO, petitioner testified that she was frightened by respondent's persistent contacts, because of their irrational and paranoid tone, their references to "danger" and "contamination," and respondent's unfounded belief that he and petitioner could have a relationship. She testified that she feared for her own safety and for that of her son:

"Q.   And, were you fearful for your safety, or your child's safety?

"A.   I was. Yes. And I continue to be. You know, it's talking about, that it's Romeo and Juliet. Obviously had a tragic ending.

"The fact that what he's saying is so out of touch with reality, you know, I found extremely frightening that—it's just—you know, he obviously was able to learn things about me personally, and my son personally. I was extremely frightened, you know.

"By contacting my parents, as well. Finding out where they lived. Going to their house. I felt very frightened that he would come to my house or go to my son's school, or, you know—and, when it became obvious that the contact—that we weren't going to have a relationship, it seemed very frightening with what could happen in that case."

Respondent, who represented himself at the hearing, cross-examined petitioner and asked her if he had ever made any threatening remarks to her. Petitioner testified that, although respondent had never threatened her personally, she considered the situation to be threatening because it seemed so unpredictable and irrational. Respondent testified on his own behalf, explaining that he never intended to harm petitioner or anyone else.

The court explained to the parties that, because of the communicative nature of respondent's contacts, the court could enter a permanent SPO order only if it found that respondent's contacts constituted an imminent serious physical threat. *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999) (A threat "is a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts."). The trial court found

"that, under the circumstances, given the content of the letters, indicating that there was references to her son, references to contamination of other people, reference to the Romeo, Juliet relationship; that [respondent] made further contact through her parents after the * * * temporary order had been entered; that, despite his statements that he had said that he would stop any contact if that was indicated to him, that that was her wishes; that, despite that, he still continued to contact her, so I find that it is objectively reasonable for a person in her position to have been alarmed by his contact.

"I find that his contact caused her reasonable apprehension regarding her own safety and the safety of her son, based on her own testimony about him making inquiries about her son, and making—continuing to make contact regarding her, by clear indication that it was to stop; that, because of the nature of the contact in terms of their bizarreness and some of the language used in his communication; that he appeared to her to be unpredictable, and 'delusional,' was the word she used; that, based on that, it was reasonable that she would feel that apprehension.

"I find that, based on the pattern of contact, the duration of contact, and the morosity of the contact with regard to her through her workplace, her parents' home, her own home, accessing her voicemail when it wasn't—her phone

at home, when, although she was in the book, she said she wasn't in the phone book in the complete—under her complete name.

"These kinds of contacts and the efforts that [respondent] clearly went to in order to make these contacts, in the face of the—of the indication that they were unwanted, I find that, in fact, it is a credible threat to her physical safety, and, based on that, I am going to enter the permanent stalking order."

On appeal, respondent contends that the trial court's order violates his free speech rights under Article I, section 8, of the Oregon Constitution.

■ To obtain an SPO under ORS 30.866(1), a petitioner must demonstrate by a preponderance of the evidence that

"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

ORS 30.866(1) has both subjective and objective components. To satisfy the subjective component, the contacted person must in fact be alarmed or coerced by the contacts, and the contacts must cause the person apprehension regarding his or her personal safety or the personal safety of a member of his or her immediate family or household. ORS 30.866(1)(a), (c); *Weatherly v. Wilkie*, 169 Or App 257, 259, 8 P3d 251 (2000). To satisfy the objective component, the contacted person's alarm or coercion must be objectively reasonable and that person's apprehension for his or her personal safety must also be objectively reasonable. ORS 30.866(1)(b); *Pinkham v. Brubaker*, 178 Or App 360, 372, 37 P3d 186 (2001).

ORS 30.866 also requires that a petitioner establish repeated and unwanted contact by the respondent. "Repeated" contact means two or more contacts within the previous two years. ORS 163.730(7). The contacts may include, among other things, coming into the person's visual or physical presence; following the person; waiting outside the person's home, property, place of work, or school; speaking with the person; or sending or making written communications of any kind. ORS 163.730(3).[1]

■ As the trial court noted in its ruling, if the contact involves speech, Article I, section 8, of the Oregon Constitution requires proof that the contact constitutes a threat. *Rangel*, 328 Or at 303. A threat "is a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *Id*. But a threat does not include "the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee." *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985).

■ ■ As respondent contends, most of his contacts were communicative. In order for the communication-based contacts in and of themselves to establish the basis for the

_____

[1] ORS 163.730(3) defines "contact" for purposes of ORS 30.866 as including but not limited to:

"(a) Coming into the visual or physical presence of the other person;

"(b) Following the other person;

"(c) Waiting outside the home, property, place of work or school of the other person or of a member of that person's family or household;

"(d) Sending or making written or electronic communications in any form to the other person;

"(e) Speaking with the other person by any means;

"(f) Communicating with the other person through a third person;

"(g) Committing a crime against the other person;

"(h) Communicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person;

"(i) Communicating with business entities with the intent of affecting some right or interest of the other person;

"(j) Damaging the other person's home, property, place of work or school; or

"(k) Delivering directly or through a third person any object to the home, property, place of work or school of the other person."

SPO, the record must also establish that the communications instilled in petitioner a fear of imminent and serious personal violence, that the threat was unequivocal, and that it was objectively likely to be followed by unlawful acts. *Rangel*, 328 Or at 303; *see Goodness v. Beckham*, 224 Or App 565, 574, 198 P3d 980 (2008). Although petitioner testified that respondent's contacts caused her to fear for her safety and the safety of her child, she did not testify that she feared imminent and serious personal violence from respondent. She admitted, in fact, that respondent had never directly threatened her. We are unable to find on this record that respondent made an unequivocal threat that was objectively likely to be followed by unlawful acts and that instilled in petitioner a fear of imminent and serious personal violence. We conclude, therefore, that the communications themselves do not provide a basis for the entry of the SPO.

■     Nevertheless, those communications provide context for respondent's other, noncommunicative contacts. *Wood v. Trow*, 228 Or App 600, 605, 208 P3d 1030 (2009); *Habrat v. Milligan*, 208 Or App 229, 237, 145 P3d 180 (2006) (expressive contacts that may not be sufficient to support the issuance of an SPO, "nevertheless, are relevant context for respondent's nonexpressive contacts with petitioner"). After respondent had been told by petitioner and others that petitioner did not want contact from him, he continued to contact her by coming to her place of employment and going to her parents' house. Those contacts caused petitioner to be "extremely frightened" for her safety. In light of respondent's many communications, the noncommunicative contacts form a pattern of behavior that made petitioner's apprehension reasonable.

We conclude that petitioner established that respondent intentionally engaged in repeated unwanted contacts, that it was reasonable for petitioner to have been alarmed by the contacts, and that the contacts in fact caused petitioner apprehension regarding her personal safety or the safety of a member of her immediate family. ORS 30.866. We conclude, therefore, that the trial court did not err in entering a SPO.

Affirmed.