Argued and submitted January 16, 2019, affirmed March 11, 2020

M. D. O.,
*Petitioner-Respondent,*

*v.*

Jeff A. DESANTIS,
*Respondent-Appellant.*

Marion County Circuit Court
17SK02472; A166829

461 P3d 1066

Respondent appeals a permanent stalking protective order (SPO), contending that the trial court erred in determining that petitioner's alarm when petitioner was being followed by respondent was objectively reasonable. He also contends that the trial court erred in determining that his statement to petitioner, "If I don't get you now, I'll get you later," was a qualifying predicate contact for issuance of an SPO, because the statement (1) was not a threat of imminent serious harm and (2) did not cause petitioner to fear imminent and serious personal violence. *Held*: The trial court did not err. Given the acrimonious relationship between petitioner and respondent, petitioner's alarm when he was being followed by respondent was objectively reasonable. Further, in light of contextual factors, including petitioner and respondent's acrimonious relationship and their historical conduct toward each other, respondent's statement was a threat of imminent serious harm. Finally, from petitioner's testimony, the trial court could infer that respondent's statement caused petitioner to fear imminent and serious personal violence.

Affirmed.

Janet A. Klapstein, Judge pro tempore.

Andy Simrin argued the cause for appellant. Also on the brief was Andy Simrin PC.

No appearance for respondent.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

TOOKEY, J.

Affirmed.

**TOOKEY, J.**

This is a civil stalking case involving what the trial court aptly described as "bad blood" between two individuals who, after two of petitioner's children assaulted respondent, simply could not, as the trial court viewed it, "leave well enough alone."[1] During the year following the assault of respondent by petitioner's children, the parties' anger with each other grew and ultimately culminated in respondent following petitioner, stating that he would "get" petitioner, and petitioner seeking a stalking protective order (SPO) against respondent under ORS 163.738. As explained further below, for a trial court to issue an SPO under ORS 163.738, a petitioner must demonstrate that there have been at least two qualifying "contacts" between the respondent and the petitioner. In this case, the trial court determined that there were two such qualifying contacts and issued an SPO.

On appeal, respondent raises two assignments of error, which, given his arguments, he acknowledges present "essentially the same legal question": In his first assignment of error, he contends that the trial court "erred by finding that there were two qualifying contacts for the purposes of the stalking statutes." In his second assignment of error, he contends that the trial court "erred by issuing a permanent stalking protective order." For the reasons that follow, we affirm.

As an initial matter, we note neither party has requested that we review this matter *de novo*. Because this is not an exceptional case, we will not do so. *See* ORAP 5.40(8)(c) (providing that the court will exercise its discretion to review *de novo* "only in exceptional cases"). Therefore, given the trial court's conclusion that the SPO should issue, "we view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the petitioner." *Gray v. McGinnis*, 277 Or App 679, 680, 374 P3d 941 (2016) (internal quotation marks omitted). Additionally, we review as "a question of law whether the evidence presented was

---

[1] In civil stalking cases, such as this one, we ordinarily refer to the parties by their designation in the trial court. *King v. W. T. F.*, 276 Or App 533, 534 n 1, 369 P3d 1181 (2016) (so stating).

sufficient to support the elements required to obtain an SPO." *Id.* (internal quotation marks omitted).

## BACKGROUND

Before turning to the "contacts" on which the trial court relied when issuing the SPO, we provide a brief summary of the historical "bad blood" between petitioner and respondent to provide appropriate context for those contacts.

Petitioner and respondent are both residents of a small community in Oregon. In January 2017, petitioner's two sons—who were juveniles at the time—assaulted respondent outside of a restaurant that respondent co-owned, causing what the trial court described as "pretty significant leg injuries" to respondent.[2] Respondent viewed petitioner's sons' assault on him as "life-changing"; as a result of the assault, he had to have steel plates embedded in his leg and ankle, and he suffered ongoing medical concerns as a result of his injuries.

The day after the assault, petitioner went to respondent's restaurant. Petitioner felt that respondent, and not petitioner's two sons, was responsible for the assault. After entering the restaurant, petitioner spoke to a co-owner of the restaurant and asked to see respondent, whom petitioner accused of being a "child molester" or "child abuser." Petitioner further stated that he wanted to "kick [respondent's] ass" and that he should "burn down" the restaurant. He explained to the co-owner that, in his view, had it been the co-owner's children involved in the assault, the co-owner would also want to burn down the restaurant to "get at the guys who did this to your kids." During the hearing on the SPO, the co-owner described petitioner as having been "seething with palpable anger," and explained that he was concerned petitioner was going to become violent. The co-owner reported the incident to the police and to respondent's wife.

---

[2] The trial court described petitioner's sons' conduct as an "assault" of respondent. In a separate proceeding, petitioner's sons were found to be within the jurisdiction of the juvenile court for their conduct *vis-à-vis* respondent. For ease of reference in describing petitioner's sons' conduct in this opinion, as the trial court did, we refer to petitioner's sons' conduct as "assault."

Petitioner's sons' assault of respondent resulted in the state filing delinquency petitions to bring petitioner's sons within the jurisdiction of the juvenile court. At some point during the pendency of those proceedings, respondent obtained copies of petitioner's sons' school records and contacted an individual employed by the Oregon Youth Authority (OYA) regarding those records. The OYA employee was concerned by respondent's possession of the records and, eventually, an attorney for one of petitioner's sons was informed that respondent had obtained the school records. The attorney informed petitioner.

In the summer of 2017, respondent was arrested for allegedly assaulting a private investigator who was involved in one of petitioner's sons' juvenile court cases. Respondent was charged with assault.[3] Petitioner believed that respondents' alleged assault on the private investigator was severe enough to cause the private investigator to be "put *** in the hospital."

Following respondent's arrest and charges being brought against him related to the alleged assault of the private investigator, petitioner obtained and distributed copies of the arrest report and criminal complaint related to the alleged assault at locations around petitioner and respondent's community—for example, at a tire store, a grocery store, and the post office—as well as to individuals in petitioner's and respondent's community.[4] Respondent was aware of petitioner's distribution efforts. Respondent asked local police to speak with petitioner about distributing the documents and request that petitioner stop doing that, but, nevertheless, petitioner persisted in distributing them. The trial court characterized petitioner's distribution campaign as "inappropriate."

Additionally, in the summer of 2017, petitioner and respondent were driving in opposite directions in the downtown

_____

[3] At the time of the SPO hearing, the charges against respondent related to the alleged assault on the private investigator were pending. The charges were ultimately dismissed after a civil compromise was reached.

[4] In its ruling, the trial court explained that it considered the assault charge that was then pending against respondent only insofar as "it is an underlying basis for the passing out all these documents *** that caused the latest round of angry activity."

of their community. Though petitioner had the right of way, respondent, on seeing petitioner, snapped, and made a quick left turn in front of petitioner, which required petitioner to slam on his brakes to avoid T-boning respondent's pickup truck. Respondent then started laughing and slowed his truck down so that petitioner could see respondent's reaction—namely, laughter—to nearly causing a collision with petitioner. The force with which petitioner had to slam on his brakes to avoid hitting respondent caused petitioner physical pain due to preexisting spine and neck injuries.

The first contact on which the trial court based its decision to issue the SPO occurred on September 19, 2017. On that day, respondent observed petitioner driving in the local downtown area, near the local grocery store and tire store in which petitioner had previously distributed the documents related to respondent's alleged assault on the private investigator. Respondent had been informed by an employee of the tire store that, only a few days before, petitioner and one of his sons were distributing those documents in the tire store. Respondent, angry at petitioner for distributing the documents, pulled his truck behind petitioner's truck and began to follow closely behind him.

Petitioner observed respondent following closely behind him and believed that respondent wanted to follow petitioner to petitioner's house. Petitioner also saw that respondent did not take the turn that respondent usually takes when respondent is going to respondent's house. Petitioner kept driving, followed closely by respondent, out into "farm country." Eventually petitioner, concerned that he was in farm country alone with respondent, turned his car around in a farmer's field and headed back into town and into the parking lot of the local police department to seek protection. Respondent also turned around and, after doing so, followed petitioner into the police department parking lot. The total distance respondent followed petitioner was approximately 15 miles. Petitioner perceived respondent to be "hunting [him] down."

Petitioner entered the police department, and respondent followed petitioner inside. Once inside the police department, respondent snapped and proceeded to say to

petitioner that petitioner's ex-wife is a "whore" and a "slut," that petitioner's "fucking kids are bastards," and that his ex-wife had petitioner's children "through another guy." Petitioner testified that the experience left him "rattled."

The second contact on which the trial court based its decision to issue the SPO occurred on November 19, 2017. On that day, petitioner was waiting in the parking lot of a local restaurant for a pizza to be ready when he heard someone's voice, turned his head, and saw respondent's truck "window to window" with his own. The trucks were close enough that petitioner was not sure if he could open his door without dinging respondent's door. Respondent again snapped and proceeded to call petitioner a "hillbilly" and petitioner's ex-wife "every nasty thing you can think of." Petitioner responded with "every four-letter word [he] could think of." Petitioner testified that he believed respondent engaged in that exchange because respondent wanted petitioner to instigate a physical fight so that respondent could "be the victim," and that respondent could not "control himself."

Respondent then told petitioner "let's go," "I'll fight you right here," and that he wanted to "beat the shit out of" petitioner. He also told petitioner, "If I don't get you now, I'll get you later." Petitioner perceived this to be a direct "threat" to harm petitioner and was frightened. Petitioner testified that respondent's statements left him "rattled." Petitioner also testified that he believed respondent would follow through on his stated intent to "get" petitioner, because respondent had previously been accused of engaging in a violent act—*viz.*, assaulting the private investigator. Petitioner feared that he or his children would be the next target of respondent's violence, because respondent felt petitioner was responsible for respondent's estrangement from his wife and his business troubles, and blamed petitioner and petitioner's sons for the assault.

The next day, November 20, 2017, petitioner executed a uniform stalking complaint, ORS 163.744, which was filed on November 22, 2017. On December 27, 2017, the trial court issued an SPO, determining that respondent's September 19, 2017, following of petitioner and respondent's

November 19, 2017, verbal exchange with petitioner constituted qualifying contacts for issuance of an SPO. When so doing, the court considered the history of animosity between the parties that had gone on for almost a year, and that rather than settle down over time, the parties' anger with each other had instead gotten "worse and worse and worse and worse." It also determined that petitioner was "understandably frightened" about respondent's "hot temper" (and that respondent was "understandably frightened" about petitioner's "hot temper") and that respondent's November 19, 2017, verbal exchange with petitioner was something more than a "simple exchange of bad words," but included an "overt threat" by respondent to petitioner—*viz.*, that respondent said to petitioner that he would "get you now, [or] get you later."

## ANALYSIS

The SPO in this case was issued pursuant to ORS 163.738, which begins with a complaint by the victim and a law enforcement officer's issuance of a citation to the respondent.[5] Under ORS 163.738(2)(a)(B), a trial court may enter an SPO if it finds by a preponderance of the evidence that

"(i)   The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(ii)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(iii)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

Thus, the statute requires at least two unwanted contacts. *See* ORS 163.730(7) ("'Repeated' means two or more times."). Each contact "must give rise to subjective alarm and that alarm must be objectively reasonable, and

---

[5] By contrast, an SPO proceeding under ORS 30.866 begins with a victim directly petitioning the court for an SPO. Both ORS 30.866 and ORS 163.738 require the same evidentiary showing. *Carter v. Bowman*, 249 Or App 590, 594, 277 P3d 634, *rev den*, 352 Or 377 (2012).

the contacts, cumulatively, must give rise to subjective apprehension regarding the petitioner's personal safety or the personal safety of a member of the petitioner's immediate family or household, and that apprehension must be objectively reasonable." *Blastic v. Holm*, 248 Or App 414, 418, 273 P3d 304 (2012). "Alarm" is defined by statute to mean "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). "Danger" refers to "a threat of physical injury, and not merely a threat of annoyance or harassment." *Outlaw v. Richey*, 301 Or App 18, 28, 456 P3d 348 (2019) (internal quotation marks omitted). A "contact" includes "almost any interaction with the petitioner and can be divided between nonexpressive contacts and expressive, also known as communicative, contacts." *Christensen v. Carter/Bosket*, 261 Or App 133, 140, 323 P3d 348 (2014); *see also* ORS 163.730(3) (defining "contact").

Because "expressive contacts" implicate Article I, section 8, of the Oregon Constitution and the First Amendment to the United States Constitution, a "more stringent standard applies when we evaluate the sufficiency of the evidence of alarm" caused by expressive contacts. *Outlaw*, 301 Or App at 28 (internal quotation marks omitted). "The Supreme Court has explained that, in defining alarm, the legislature necessarily contemplated that speech-based contact could comprise an element of stalking only if it 'constitutes a threat.'" *Id.* (quoting *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999)). Under *Rangel*, a "threat" is "'a communication that instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts.'" *Christensen*, 261 Or App at 140 (quoting *Rangel*, 328 Or at 303). Qualifying threats do not include "'the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee.'" *Id.* (quoting *Rangel*, 328 Or at 304).

We turn first to respondent's September 19, 2017, following of petitioner. As we understand respondent's argument, with regard to that nonexpressive contact, respondent contends that petitioner's alarm was not "objectively

reasonable" and characterizes his conduct as mere "objectively innocuous following." In respondent's view, that is so because "there was nothing about respondent's driving that would have made it objectively reasonable for petitioner to be reasonably apprehensive about his personal safety."

We disagree with respondent that his following of petitioner was "objectively innocuous." As we have emphasized in other cases, "unwanted contacts must be considered in the context of the parties' entire history." *Pinkham v. Brubaker*, 178 Or App 360, 372, 37 P3d 186 (2001). So viewed, contacts that "might appear innocuous *** in isolation often take on a different character." *Id.* (internal quotation marks omitted).

Here, given the highly acrimonious relationship between petitioner and respondent, we conclude that petitioner's alarm when he was being closely followed by respondent for 15 miles, including in "farm country" with no one else around, was objectively reasonable. That is, against the backdrop of the parties' history—*viz.*, (1) petitioner's children causing significant "life-changing" injuries to respondent for which respondent, in part, blamed petitioner, (2) petitioner having previously accused respondent of being a "child molester" or "child abuser," and stating that he would burn down respondent's business, (3) respondent previously obtaining petitioner's children's school records, (4) petitioner's belief that respondent had previously assaulted a private investigator who was involved in one of petitioner's sons' juvenile court cases,[6] (5) petitioner's campaign to publicize that alleged assault, (6) respondent previously nearly causing a collision with petitioner while they were driving and then laughing about it, and (7) respondent's "hot temper"—respondent's conduct of closely following behind

---

[6] Although the charges against respondent related to the assault were ultimately dismissed, the accusation against respondent of engaging in a violent act supports the conclusion that a petitioner's alarm was objectively reasonable. *See, e.g., Bryant v. Walker*, 190 Or App 253, 257, 78 P3d 148 (2003), *rev dismissed as improvidently allowed*, 337 Or 585 (2004) (considering fact that, "at some point in the past, respondent's then-wife had accused him of violence" in concluding petitioner's "alarm and fear were reasonable"); *Habrat v. Milligan*, 208 Or App 229, 239, 145 P3d 180 (2006) (concluding petitioner's alarm was objectively reasonable, where, among other facts, petitioner was informed by respondent's girlfriend that she feared personal harm from him).

petitioner into "farm country," turning around when petitioner did so, and continuing to follow petitioner for a total of 15 miles, would cause a reasonable person in petitioner's situation to experience "apprehension or fear resulting from the perception of danger."[7] ORS 163.730(1); *see Smith v. Di Marco*, 207 Or App 558, 564, 142 P3d 539 (2006) (respondent's act of following and watching petitioner was a predicate contact for an SPO); *cf. Weatherly v. Wilkie*, 169 Or App 257, 263, 8 P3d 251 (2000) (record was insufficient to find alarm and apprehension about personal safety were objectively reasonable where there was "no evidence *** of prior violence, explosive emotions, unstable behavior, or threatening dealings between the parties"). Although some of petitioner's conduct set forth above *vis-à-vis* respondent may have been, as the trial court noted, "inappropriate," that does not take respondent's response to that conduct—*i.e.*, following petitioner—outside the purview of ORS 163.738. Accordingly, we conclude that petitioner's alarm was objectively reasonable.

We turn to respondent's November 19, 2017, expressive contact with petitioner. Respondent contends that, what he characterizes as his "challenge to petitioner to get out of his vehicle and fight," cannot constitute a qualifying contact for two reasons. First, any threat of violence was not "imminent." That is so, respondent urges, because petitioner's and respondent's trucks were parked so close to each other that the doors could not have been opened without dinging each other, and accordingly, for respondent to have caused any injury to petitioner, "either one of them would have had to move their vehicle or respondent would have had to exit his passenger side door, gone around both cars and open petitioner's passenger side door to get at petitioner." Second, that respondent's comments did not actually instill a subjective "fear in petitioner that respondent would engage in a violent act," but instead, "instilled a belief that [respondent] was trying to bait petitioner into engaging in violence."

---

[7] Respondent also contends petitioner never described what it was that he feared respondent might do and there is no other evidence in the record that suggests what type of harm petitioner might have anticipated, so there was "no basis for concluding that any apprehension was objectively reasonable." Given the parties' history with each other—including respondent's prior conduct of nearly causing a collision with petitioner while they were driving—we disagree.

Our analysis in *Layne v. MacDonald*, 267 Or App 628, 340 P3d 773 (2014), is instructive in addressing respondent's first argument on appeal regarding his November 19, 2017 contact with petitioner—*viz.*, that his statement was not a threat of "imminent" violence. In that case, we considered whether a respondent's statement to the petitioner, his ex-wife, that he would "fuck [her] up" was an (1) "unequivocal" threat of (2) "imminent personal violence," which would satisfy the standard articulated for expressive contacts in *Rangel*. *Layne*, 267 Or App at 631-32.

We first determined that the respondent's statement —that he would "fuck [the petitioner] up"—was an "unequivocal" threat, noting that it was "a colloquial term that, in context, has but one meaning." *Id.* at 632.

Next, we addressed whether the threat was of "imminent serious physical harm," acknowledging that that was a "somewhat closer" question. *Id.* We explained that "a threat is [not] imminent only if the threatened harm is 'immediate.'" *Id.* at 633. Rather, the "plain and ordinary" meaning of "imminent" is "'ready to take place'" or "'near at hand.'" *Id.* (quoting *Webster's Third New Int'l Dictionary* 1130 (unabridged ed 2002)). With that understanding, we looked to "contextual factors," and determined that the respondent's statement was a "threat of imminent serious harm." *Id.* The "contextual factors" in *Layne* included that the respondent had assaulted the petitioner during their marriage, he bragged that he killed people while serving in the military and warned that he could do the same to her, he repeatedly showed a willingness to break the law by allegedly violating his no-contact order multiple times, he threatened to send his "skinhead" friends to harm her if she reported those violations, and he actually had "skinhead" acquaintances. *Id.* at 629, 633.

Here, as was the respondent's statement to the petitioner in *Layne*, respondent's statement to petitioner in this case was "unequivocal." That is, the statement, "If I don't get you now, I'll get you later," when viewed in the context of respondent's surrounding statements to petitioner—*viz.*, that he wanted to "beat the shit out of" petitioner and would "fight [him] right here"—has but one meaning. *Cf. Outlaw*,

301 Or App at 38 (statement "I'm coming for you," when ana-
lyzed in "the context of [the respondent's] surrounding state-
ments," was reasonably understood as a promise to hold the
media accountable through respondent's own "reporting,"
not a threat of violence). Respondent's statement was not a
mere "vague invitation to fight." *Cf. Christensen*, 261 Or App
at 142 (statement, "Come down here, motherfucker, and I'll
show you," was not a threat under *Rangel*, as it was only "a
vague invitation to fight"); *State v. Jackson*, 259 Or App 248,
249-50, 313 P3d 383 (2013) (accepting state's concession that
defendant's statement that he "wanted to fight" victim and
called victim a "pussy" was not a threat under *Rangel*, where
there was no evidence that defendant approached victim).

Although the "contextual factors" are not as extreme
as they were in *Layne*, the "contextual factors" in this case
lead us to conclude that respondent's statement, "If I don't
get you now, I'll get you later," was a "threat of imminent
serious harm," *Layne*, 267 Or App at 633. As described
above, petitioner and respondent had a highly acrimoni-
ous relationship that had persisted for almost a full year.
During that time, as the trial court found, rather than
settle down, their anger with each other had continued to
grow and grow. Respondent continued to be angry with
petitioner, had a "hot temper," and had snapped on multi-
ple occasions upon seeing petitioner. Respondent blamed
petitioner for respondent's estrangement from his wife, his
business troubles, and the assault by petitioner's children,
which was "life-changing" for respondent. Respondent had
previously engaged in conduct that posed a direct risk to
petitioner's physical safety—*viz.*, nearly causing a collision
with petitioner's truck. Given where respondent had parked
his truck, petitioner was prevented from getting out of peti-
tioner's truck in the usual manner—*i.e.*, through the front
driver's-side door. And, respondent's presence next to peti-
tioner's truck was unexpected.

Against that backdrop, respondent's statement—"If
I don't get you now, I'll get you later"—was not mere "hyper-
bole, rhetorical excesses, [or] impotent expressions of anger
or frustration." *Rangel*, 328 Or at 303 (internal quotation
marks omitted). Although respondent might be correct that

he would have had to move his car or exit his car to cause injury to petitioner, that does not mean his statement was not a threat of imminent serious harm—*i.e.*, threating harm that is "near at hand." *Layne*, 267 Or App at 633; *see also DiCarlo v. McCarthy*, 208 Or App 184, 186, 188, 145 P3d 178 (2006) (respondent's statements to petitioner, "I'm going to fuck you up, I'm going to fuck your old man up, and I'm going to fuck your truck" up, and "I'll get you, I'll find you, it's a small town," was a qualifying contact for issuance of an SPO, as "respondent's verbal communications were overtly threatening, and they reasonably put petitioner in fear of immediate and serious personal violence from respondent"); *cf. Goodness v. Beckham*, 224 Or App 565, 578, 198 P3d 980 (2008) (emails from respondent to petitioner did not contain an "*imminent* threat" where respondent lived in California, did not know petitioner's address, and there was no evidence that respondent intended to follow up the email statements with imminent unlawful acts (emphasis in original)).

We also disagree with respondent's second contention—that the trial court erred in issuing an SPO because respondent's comments did not actually instill a subjective "fear in petitioner that respondent would engage in a violent act," but instead "instilled a belief that [respondent] was trying to bait petitioner into engaging in violence." To be sure, respondent is correct that petitioner testified during the SPO hearing that he believed respondent engaged in name calling because respondent wanted petitioner to instigate a physical fight so that respondent could "be the victim." But that was not petitioner's only testimony: Petitioner also testified that he believed respondent would follow through on his threat to harm petitioner, that respondent could not "control himself," that respondent's threat had left him "rattled," and that he had previously felt like respondent was "hunting him down." Further, petitioner had previously sought police protection from respondent. Although petitioner may not have used the words "fear of imminent and serious personal violence," *Rangel*, 328 Or at 303, when testifying, from petitioner's testimony the trial court could infer that he did, in fact, subjectively have such a fear. *Boyd v. Essin*, 170 Or App 509, 517-18, 12 P3d 1003 (2000), *rev den*, 331 Or 674 (2001) (concluding that, although "petitioner did not repeat

the words of the statute and say that she had been subjectively alarmed" the court could "infer from her testimony, in light of the nature of respondent's contacts * * * that she was in fact alarmed," and that "it was objectively reasonable for petitioner to be alarmed").

In sum, as described above, the parties to this case had a year-long relationship marred by a growing enmity, in which one of them had already suffered a significant injury. Their conduct *vis-à-vis* each other was seemingly unthethered from social mores. Against the backdrop of that historical "bad blood," we conclude that the trial court did not err in determining that petitioner had made the requisite showing for issuance of an SPO.

Affirmed.