Submitted February 2, affirmed September 27, 2023

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# KRISTOFER MICHAEL JOHNSON,
*Defendant-Appellant.*

Yamhill County Circuit Court
18CR80923, 18CR02723;
A175405 (Control), A175406

536 P3d 1029

Defendant challenges his convictions for stalking, ORS 163.732, and telephonic harassment, ORS 166.090. Defendant argues that the trial court erred by denying his motion for judgment of acquittal because his contacts with two individuals were constitutionally protected expressive communications that do not meet the standard established in *State v. Rangel*, 328 Or 294, 977 P2d 379 (1999). Specifically, he argues that the state presented insufficient evidence to prove that the threats were imminent or caused subjective fear. *Held*: The trial court did not err. The record and factual context of the parties' relationship permitted a reasonable factfinder to find that defendant's contacts satisfied the Rangel standard. The Court of Appeals also rejected defendant's unpreserved telephonic harassment arguments.

Affirmed.

Ladd J. Wiles, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Matthew Blythe, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Carson L. Whitehead, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Affirmed.

**SHORR, P. J.**

In this consolidated criminal appeal, defendant challenges his convictions for stalking, ORS 163.732, and telephonic harassment, ORS 166.090, and a resulting probation revocation judgment. He raises 10 assignments of error, contending that the trial court erred in denying his motion for judgment of acquittal (MJOA) because his contacts with two individuals were constitutionally protected expressive communications that do not meet the standard established in *State v. Rangel*, 328 Or 294, 977 P2d 379 (1999). He also advances constitutional and evidentiary challenges to his telephonic harassment convictions. As explained below, we conclude that the contacts were not protected expressions under Article I, section 8, of the Oregon Constitution and that the state's evidence was sufficient to satisfy the *Rangel* standard. We also reject defendant's unpreserved telephonic harassment arguments because they either do not demonstrate that the trial court committed plain error or we do not exercise our discretion to consider them in these circumstances. Accordingly, we affirm.

"We review the denial of an MJOA to determine whether, after viewing the facts and all reasonable inferences in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Murphy*, 306 Or App 535, 536, 475 P3d 100 (2020), *rev den*, 367 Or 559 (2021) (internal quotation marks omitted). We describe the facts in accordance with that standard. *Id.*

Defendant and J were in a relationship for two years. During their relationship, J introduced defendant to her next-door neighbor, M. Defendant and M's brief friendship ended when defendant sent M a text message accusing him of having an affair with J and threatening to take M's prosthetic leg off and beat him with it. After confronting defendant in person, M asked the police to stop defendant from contacting him. Although defendant stopped messaging M for a short time, he eventually resumed messaging and threatened to beat M up. M's wife also saw defendant sitting on his bicycle outside of their home at different times of day.

J and defendant ended their relationship in January 2018, and J tried to sever communication with defendant in September. Although she blocked his phone number, defendant continued to call and email her thousands of times, filling her voicemail box on a nightly basis. Defendant also flew his drone over J's and M's homes to surveil them with it. After defendant accessed J's cell phone and her Facebook accounts without permission and used the information to contact her friends, she reported defendant's conduct to the police. Although a police officer told defendant that he would be subject to arrest if he contacted J, defendant continued to contact her.

A few weeks later, defendant left J a series of messages describing images of J's home that he had seen with his drone. The messages referenced her police interview, accused J and M of getting him thrown in jail, and blamed J for destroying his life. Defendant also said that J "should have to suffer like [he had] suffered for the last three years." After contacting the police again, J secretly moved to a different residence within the town. After she moved, defendant left her messages saying that he was at her (now-former) residence and asking why she did not answer at the door.

On November 27, defendant left J the following voice messages: "[M], you're dead. You just died together. Goodbye," and "Stay away from [M]. [M] is dead. This is to keep you and the kids away from [M]. [M] is dead." On the same date, defendant also left M six voice messages over a 90-minute period that each said M was "dead" or would die. The messages included:

- "Well, you're just going to like to die. You're going to feel that. I would like to know what it feels like when your blood is fucking gushing out of your chest. *** Hey, [M], you're dead. Goodbye. *** You're going to die. Because you wouldn't tell me the truth."

- "Guess what, [M], you die. You're dead. You are gone. You know what, I'm awake now. [M], you're dead. You're gone. You're goodbye. It won't be by me. It doesn't have to be. Watch your back *** You're dead. You're gone. Goodbye."

- "[H]ey [M] how does it feel to be on your wife's—well I guess to be your soon ex-wife phone plan? *** [M], how does it feel to be dead? You're dead."

- "But you're not even going to see it coming. Because the work—the order's been put in. The work had better be done. Not by me because you're a punk. *** In fact this is one of your old boys from Nevada. He's going to do it. Mother fucker. Bye-bye."

M called the police and said that defendant's reference to M's wife's cell phone plan—which he had never discussed with defendant—"disturb[ed] [him] even more."

The state charged defendant with two counts of stalking that were based on the November 27 voice messages to both J and M and six counts of telephonic harassment. Because defendant waived a jury trial, the case was tried to the court. At trial, the state presented evidence of the foregoing facts. Significantly, J also testified that defendant had previously punched her in the face and threw a two-liter bottle of soda through her car window. She also testified that defendant often referenced her children in his messages and had texted her 12-year-old son.

M testified that he was "pissed" after he received the voicemails because defendant had "threatened [his] life" and that it "took a while" for him to calm down. M testified that he had told defendant that he previously lived in Nevada and believed that defendant was capable of carrying out the threats based on their prior dealings. M also testified that he "didn't want some crazy dude coming over to [his] house trying to kill [him]," that he was "more in fear for [his] kids," and that he would do whatever he needed to protect his family.

Defendant moved for judgment of acquittal on all counts, arguing that the evidence was insufficient to prove that M feared for his own safety or that defendant's threats to J were imminent because he did not know where she lived on November 27. The trial court denied the MJOA, concluding that the evidence was sufficient to establish the elements of each offense. Following the bench trial, the court found defendant guilty on all counts and this appeal followed.

In his first four assignments of error, defendant advances a combined argument and contends that the trial court erred in both denying his motions for judgment of acquittal and finding defendant guilty, because the evidence was insufficient to support his convictions for stalking J and M. Defendant was charged with two counts of stalking under ORS 163.732, which provides, in part:

"(1)   A person commits the crime of stalking if:

"(a)   The person knowingly alarms or coerces another person or a member of that person's immediate family or household by engaging in repeated and unwanted contact with the other person;

"(b)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

Alarm means "to cause apprehension or fear resulting from the perception of danger." ORS 163.730(1). As relevant here, "contact" includes "[s]peaking with the other person by any means," and "repeated" means two or more times. ORS 163.730(3)(f), (7).

When contacts are based on expressive communication—such as speech or writing—they "must consist of a threat that convincingly expresses *to the addressee* the intention that it will be carried out, and that the actor has the ability to do so" in order to comply with Article I, section 8, of the Oregon Constitution.[1] *Rangel*, 328 Or at 306 (emphasis in original). In other words, "a contact involving expression cannot underlie a stalking conviction unless the expressive contact was a threat that 'instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts.'" *S. L. L. v. MacDonald*, 267 Or App 628, 630, 340 P3d 773 (2014) (quoting *Rangel*, 328

---

[1] Article I, section 8, provides, in part, that "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak *** on any subject whatever[.]"

Or at 303).[2] However, "'hyperbole, rhetorical excesses, and impotent expressions of anger or frustration'" do not constitute threats under *Rangel*. *Rangel*, 328 Or at 303 (quoting *State v. Moyle*, 299 Or 691, 705, 705 P2d 740 (1985)).

We begin with defendant's arguments concerning his conviction for stalking J (Count 3). Defendant argues that the evidence was insufficient to prove that his threats were sufficiently imminent under *Rangel* because defendant did not know where J lived. The state responds that the evidence was sufficient for a rational juror to determine that the threats were imminent because defendant's threats to kill J were not limited to her home and because defendant's conduct showed that he had the persistence to locate her. We agree with the state.

As discussed above, a threat must cause a fear of "imminent and serious personal violence" to satisfy *Rangel*. *Rangel*, 328 Or at 303. However, we have explained that an imminent threat need not convey a risk of *immediate* harm. *S. L. L.*, 267 Or App at 633. Rather, an imminent threat is "ready to take place" or "near at hand." *Id.*; *State ex rel Juv. Dept. v. Dompeling*, 171 Or App 692, 695, 17 P3d 535 (2000) (explaining that imminent means "near at hand, impending, or menacingly near" (internal quotation marks omitted)).

When determining whether a communication constitutes a threat under *Rangel*, we consider the contacts "under the totality of the circumstances." *Murphy*, 306 Or App at 541-42.

> "[T]he factual context of the parties' relationship is probative evidence in a stalking case. That is because 'contacts that might appear innocuous in isolation often take on a different character when viewed either in combination *or against the backdrop of one party's assaultive behavior towards the other*,' something that bears on the reasonableness of the victim's response to the defendant's conduct."

*State v. Martin*, 315 Or App 689, 691, 501 P3d 554 (2021) (quoting *Boyd v. Essin*, 170 Or App 509, 518, 12 P3d 1003 (2000), *rev den*, 331 Or 674 (2001) (emphasis in *Martin*)).

---

[2] The *Rangel* standard applies to both the criminal and civil stalking statutes. *S. L. L.*, 267 Or App at 630.

For example, in *S. L. L*, we evaluated the "contextual factors" of the parties' relationship and concluded that the respondent's telephonic threat to "fuck [the petitioner] up" constituted an imminent threat. *S. L. L.*, 267 Or App at 633. In that case, the petitioner obtained a stalking protective order against the respondent after their divorce. *Id.* at 629. After considering the respondent's previous domestic violence against the petitioner, his willingness to break the law, and his prior threat that he would send his "skinhead friends" to "take care of [her]" if she reported his conduct, we concluded that the respondent threatened imminent serious physical harm. *Id.* at 629, 633.

In contrast, in *State v. Hejazi*, 323 Or App 752, 758, 524 P3d 534 (2023), we concluded that the defendant's threat that he would kill an attorney and his family before walking away did not create an inference that serious harm was imminent. In that case, the defendant and the attorney did not have a prior relationship and we concluded that neither the defendant's words nor his conduct in that encounter—approaching the attorney outside the courthouse then walking away—supported an inference that serious harm was imminent. *Id.*; *see also State v. Severson*, 325 Or App 550, 559, 529 P3d 302 (2023) (explaining that the *Hejazi* defendant "threaten[ed] a virtual stranger on a public street followed by immediate retreat").

Defendant contends that this case is similar to *Goodness v. Beckham*, 224 Or App 565, 198 P3d 980 (2008), a case in which we concluded that the respondent's emails did not constitute imminent threats under *Rangel*. In that case, the respondent sent the petitioner a series of emails over the course of a year calling her derogatory names and stating that he would get his son back and that she would "pay." *Id.* at 569. After explaining that the emails did not unequivocally threaten violence and appeared to be hyperbole, we concluded that there was no imminent threat because the respondent lived in a different state and "apparently did not know petitioner's address." *Id.* at 578. Although the respondent had shown up at the petitioner's home the year before, we determined that there was "no evidence that respondent intended to follow up the email statements with imminent unlawful acts." *Id.*

This case is distinguishable from *Goodness* and *Hejazi* in several respects. First, the *Goodness* messages did not unequivocally threaten violence. In contrast, defendant's messages stated that J would die with M and that M was already dead. Second, although the *Goodness* respondent had gone to the petitioner's home the prior year and lived in a different state, defendant and J lived in the same town and defendant had recently tried to contact J at her previous home. Finally, we observe that the *Hejazi* defendant and the attorney were practically strangers and that the facts in that case did not indicate that they had any relationship aside from the three encounters at issue. In contrast, defendant and J had been in a two-year relationship that, significant to our conclusion, included physical violence and obsessive conduct.

The evidence in the record also demonstrates that defendant was willing to use extensive and illegal means to find information about J. Defendant's attempts to locate and follow J were extreme. Before J moved, defendant flew his drone over her home to surveil her and confronted her about what he thought he saw. Defendant also hacked J's cell phone and Facebook accounts and continued to call and send her messages despite warnings that he could be arrested if he did not stop. Because defendant's conduct supports the inference that he would continue to go to great lengths to locate her, we conclude that defendant's voice messages threatened serious physical harm that was "near at hand."

In sum, in light of the backdrop of defendant's past physical violence against J and then his later persistent tracking of her after their relationship ended, defendant's threats to kill J were sufficiently imminent to meet the *Rangel* standard; that is, there was evidence that they caused a "fear of imminent and serious personal violence from the speaker, [were] unequivocal, and [were] objectively likely to be followed by unlawful acts." *Rangel*, 328 Or at 303. The trial court did not err in denying the motion for judgment of acquittal and finding defendant guilty of stalking J.

We now turn to defendant's arguments concerning his conviction for stalking M (Count 1). Defendant contends

that the trial court erred in denying his motion for judgment of acquittal because there was no evidence that his messages, as a factual matter, caused M to experience subjective fear and, consequently, do not satisfy *Rangel*. The state responds that the evidence was sufficient to show that M feared personal violence because his testimony conveyed that he was anxious and worried about defendant following through with the threats. We agree with the state.

As discussed above, a qualifying threat under *Rangel* must "instill[] in the addressee a fear of imminent and serious personal violence from the speaker." *Rangel*, 328 Or at 303. Importantly, a witness is not required to use "magic words" to convey his subjective fear. *See Boyd*, 170 Or App at 517-18 (inferring from the petitioner's testimony, the parties' previous contacts, and the respondent's "history of assaultive behavior towards petitioner" that the petitioner was "in fact alarmed"). Rather, we have concluded that a petitioner's testimony that he believed that the respondent would follow through on a threat and that he felt "rattled" and hunted, coupled with prior requests for police protection, were sufficient to permit an inference that the petitioner subjectively feared imminent and serious personal violence. *M. D. O. v. Desantis*, 302 Or App 751, 763, 461 P3d 1066 (2020).

Defendant argues that M's testimony is similar to the attorney's testimony in *Hejazi*. In that case, the attorney testified that even though he was "a little concerned" when the defendant crossed the street and approached him, he was not "super apprehensive." *Hejazi*, 323 Or App at 755. In concluding that the evidence was insufficient to show that the defendant's nonexpressive conduct alarmed the attorney, we explained that his testimony "undercuts any conclusion that the nonexpressive conduct caused sufficient alarm." *Id.* at 762.

We disagree with defendant's assessment of the evidence and conclude that M's testimony is distinguishable from the attorney's testimony in *Hejazi*. Defendant argues that M denied being in fear for his own safety. M said that he "didn't want some crazy dude coming over to [his] house trying to kill [him]," that he was "more in fear for [his] kids,"

and that he would do whatever was needed to protect them. However, the fact that M stated that he was "more" in fear for his kids does not undercut the evidence that he was, himself, subjectively fearful. M also testified that defendant's prior conduct made him believe that defendant would carry out the threats.

We consider defendant's prior conduct as relevant context for M's subjective fear. *See Martin*, 315 Or App at 691 ("[T]he details of the relationship between two parties can shed light on whether a defendant knew that particular conduct would alarm the victim, on what the victim's situation was, and on whether apprehension by the victim is reasonable under the circumstances."). In addition to the one instance where defendant and M had a direct confrontation, the evidence shows that defendant flew his drone over M's home several times and sat on his bicycle outside of M's home at different times of day. The record also contains evidence that M had previously contacted the police about defendant's messages. In light of the foregoing, we conclude that M's testimony and the evidence in the record—viewed in the light most favorable to the state—permit a reasonable factfinder to find that defendant's voicemails caused M to fear imminent and serious personal violence. The trial court did not err.

In his fifth through ninth assignments of error, defendant argues that the trial court erred by entering judgments of conviction for telephonic harassment on Counts 2, 4, 5, 6, and 8, because ORS 166.090(1)(c) is facially overbroad and not capable of judicial narrowing. Although defendant acknowledges that his argument is not preserved, he asks us to exercise our discretion to reverse the error.

Plain-error review is a two-step process. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). First, we must determine if the error is plain. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013) (A plain error is "an error of law, obvious and not reasonably in dispute, and apparent on the record without requiring the court to choose among competing inferences."). Second, if we conclude that a claimed error was plain error, then we must determine whether to exercise our discretion to review it. *Id.* at 630.

Under ORS 166.090(1)(c), a caller commits telephonic harassment when the caller intentionally harasses or annoys another person by "sending to, or leaving at, the other person's telephone a text message, voice mail or any other message, knowing that the caller has been forbidden from so doing." Despite defendant's assertion that the statute clearly "regulates protected expressive conduct and is not limited to threats of imminent, serious physical injury," we conclude that the legal points on which defendant relies are not obvious and decline to address them. *See State v. White*, 202 Or App 1, 5, 121 P3d 3 (2005), *aff'd*, 341 Or 624, 147 P3d 313 (2006) ("We do not believe it would serve the policies underlying the general rule of requiring preservation to review defendant's assignment on a plain error basis, given the nature of his assertion that his conduct was constitutionally protected.").

Finally, in his tenth assignment of error, defendant argues that the trial court erred by entering a judgment of conviction for telephonic harassment on Count 7, ORS 166.090(1)(b), because the record lacked evidence that he caused J's phone to ring. Although defendant acknowledges that the argument is unpreserved, he argues that there is no reasonable dispute that an audible ring is an element of the offense.

The state contends that defendant invited the error by acknowledging "this is telephonic harassment" in his closing argument and then arguing that he did not know that he was forbidden from calling J. In any event, the state asks us to decline to exercise our discretion to review the error, because the state could have sought additional evidence had defendant raised the issue in a motion for judgment of acquittal. We agree with the state's final point.

As mentioned above, we begin by examining whether the claimed error was plain. *Vanornum*, 354 Or at 629. ORS 166.090(1)(b) provides, in relevant part, that a person commits telephonic harassment by intentionally harassing or annoying another person and "causing such other person's telephone to ring, knowing that the caller has been forbidden from so doing." Although the statute unambiguously requires a caller to cause the other person's phone

to ring, the record lacks evidence that would permit an inference that J's phone rang on the day in question. *See State v. Shifflett*, 285 Or App 654, 665, 398 P3d 383 (2017) (explaining that ORS 166.090(1)(b) requires that a caller cause the other person's telephone to "emit an audible sound"). Thus, we conclude that the error was plain.

Despite that conclusion, we decline to exercise our discretion to review the error. At the second step of the analysis, we must consider "the important policies behind the preservation rule—*e.g.*, procedural fairness to the parties and the trial court, judicial economy, and full development of the record" before exercising our discretion to review a plain error. *State v. Parkins*, 346 Or 333, 340, 211 P3d 262 (2009). As relevant here, preservation "ensures fairness to an opposing party, by permitting the opposing party to respond to a contention and by otherwise not taking the opposing party by surprise." *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). Had defendant raised the error at trial, the state could have elicited additional testimony concerning defendant's calls and whether they caused J's phone to ring. Because defendant failed to preserve the issue and the policies behind the preservation requirement were undermined, we decline to exercise our discretion to review the error.

Affirmed.