No. 459 May 28, 2026 57

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

M. R. D.,
*Petitioner-Respondent,*

*v.*

J. H. D.,
*Respondent-Appellant.*

Baker County Circuit Court
24SK00993; A185052 (Control)

K. R. K.,
*Petitioner-Respondent,*

*v.*

J. H. D.,
*Respondent-Appellant.*

Baker County Circuit Court
24SK00992; A185053

Matthew B. Shirtcliff, Judge.

Argued and submitted October 15, 2025.

Adam L. Dean argued the cause for appellant. Also on the brief was Dean Law Group, P. C.

No appearance for respondents.

Before Shorr, Presiding Judge, Powers, Judge, and O'Connor, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

Respondent appeals from two judgments imposing permanent stalking protective orders (SPO) against him under ORS 30.866, advancing three arguments. In two arguments, he asserts that the trial court erred in granting SPOs to both petitioner M and petitioner K because the qualifying expressive contacts relied upon—which were the same incidents for each case—were insufficient under Oregon law and the non-expressive nature of those contacts would not have caused K reasonable apprehension or alarm for his personal safety. We conclude that, given the context of the contacts, including past violence, threats to kill petitioners, violation of a previous SPO, and driving from out of town to find K to tell him that he wanted to "beat [K]'s motherfucking ass," the evidence was legally sufficient to support entry of the SPOs. Respondent also asserts that the trial court erred in granting M an SPO because one of the qualifying contacts involved an incident between respondent and M's daughter-in-law, who is not an immediate family or household member. Because that argument is not preserved for appellate review, we decline to reach the merits. Accordingly, we affirm.

Absent *de novo* review, which respondent does not request and which is not appropriate in this case, we review the trial court's factual findings "for any supporting evidence and its legal conclusions for legal error." *H. L. P. v. Jones*, 309 Or App 108, 109, 481 P3d 415 (2021). Given respondent's challenge to the sufficiency of the evidence, "we view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record is legally sufficient to permit that outcome." *Id.* (internal quotation marks omitted). In so doing, we defer to the trial court's implicit and explicit credibility determinations. *M. C. H. v. Milligan*, 208 Or App 229, 231, 145 P3d 180 (2006).

We begin by describing the background, including the context of the parties' relationship, in accordance with our standard of review. Respondent and petitioner M were married for approximately 20 years. Petitioner K is M's son from a prior relationship. K and respondent had a severely

strained relationship and a falling out—approximately eight years before the underlying events at issue in this case—due to a business dispute and respondent's violence against M. Although K and M maintained a relationship, K and respondent had no relationship with one another since that falling out.

K and M both described violent events before and during the two-year period related to the SPOs. *See* ORS 30.866(6) (providing that an SPO action "must be commenced within two years of the conduct giving rise to the claim"). Before the two-year period, respondent punched holes in M's car window because he was upset that she did not answer his phone call, and respondent threatened to choke M if she called the police during an argument. In a separate interaction, respondent locked M in an RV, pushed her into the bedroom, and grabbed her hair, while yelling that if M left him and took any of his personal items, he "would slit [K]'s throat, make [M] watch, and then [M] would be next."

In addition to those instances, K and M testified about other threats and acts of violence within the two-year period. Specifically, respondent threatened that, if M touched his possessions, respondent would "kill [K] first and then [M] would be next." M left the home in response to that threat, but she needed to return to get some of her things, and she told respondent that she was going to return. Knowing that M was coming back, respondent left an array of organized keys and a handgun on the table, which the trial court found to be displayed in a threatening manner. Respondent also threatened to go to M's work and "throw[] a fit" if she did not send him money and told M's boss that M stole money from him. At one point, while respondent was in Arizona, M went to their shared storage facility in Idaho to collect personal items. While there, respondent yelled at M through a security camera system, saying that he was "going to kick your ass" and to "come back next week and see what you get." Respondent showed up at that storage facility the next day, "flipping [M] off" in the camera and showing her that he could arrive at her location quickly. M obtained a restraining order in the state of Idaho, which was in effect from December 2023 to January 2024. While

that order was in effect, respondent contacted her through the video camera system at the storage facility for a second time and again flipped her off and yelled at her through the camera.

With that background in mind, we turn to the two contacts at issue in this case, which occurred in March 2024. At that point, respondent and M had separated and were going through a divorce. Following a deposition related to the dissolution proceedings, respondent drove from Pendleton, Oregon, to Baker City, Oregon—an approximate hour and a half drive—looking for K. As K was driving away from his home, he noticed a vehicle approaching him. Because the road was narrow, K pulled over to let the oncoming vehicle pass. Before he could see who was driving the car, K noticed that the oncoming driver began "flipping [him] off." K pulled up next to the vehicle, rolled down his window, and noticed it was respondent. At this point, both cars were stopped side-by-side. K asked what respondent wanted. Respondent answered that "everything you have is because of me you motherfucking piece of shit," and "I want to beat your motherfucking ass, you motherfucking piece of shit." K testified that respondent was "in a rage and it's—it's just flat scary." K rolled up the window and drove away. K tried to call his wife, B, at home and then called the police. K also called his mother, and they locked down both her business and K's business in fear that respondent would go there. M had the police check her house to make sure respondent was not there and then met the police at K's house, where she completed a police report.

After meeting K on the street, respondent continued up the road and then turned onto the dead-end road to K's home and pulled into K's driveway. B was outside with their one-year-old son. She told respondent that he was not welcome and that he needed to leave. Respondent began yelling, "FU, you're all a bunch of cowards," and "I'm coming for you." B testified that he was leaning out of his window and that he was "angry" and "screaming." Respondent backed out of the driveway and left.

After those incidents, K and M each petitioned for an SPO. At a consolidated hearing, K and M each testified

that they were afraid of respondent, that they knew about the threats that respondent had made against them, that they were aware of past violent acts, and that they knew respondent had extensive practice with firearms and typically carried a firearm. Respondent testified that he made the threats but denied looking for K, instead explaining that he was looking for his truck. At the end of the hearing, the parties argued about which incidents qualified as a contact, each presenting the court with supporting caselaw. The court noted that "the parties have cited between them over fifteen cases just now[,]" and so it asked the parties to brief their arguments based on the record. The parties agreed. In their written closing argument, petitioners asserted that the first contact involved the interaction on March 15, 2024, between respondent and K, and that respondent made a second contact on March 15, 2024, with B.

The trial court issued a letter opinion with its findings and conclusions. The court found two separate contacts: (1) the interaction between respondent and K while in their vehicles, finding that "I want to kick your motherfucking ass" was a threat and (2) the interaction between respondent and B, finding that "I am coming for you" was a threat. The court found that these were separate contacts, noting that respondent, when faced with the opportunity to turn his vehicle back toward Baker City, chose to drive up a dead-end road to the home of K and make an additional threat to a separate individual, thus there was a sufficient pause related to separate episodes. With respect to whether the contacts were unwanted, the court found that it was undisputed that, by January 2024, M made it clear that she did not want contact with respondent and that, due to the previous severely strained relationship between K and respondent and the fact that they had not had a relationship for years, respondent knew or should have known that K did not want contact.

The trial court also found that the threats were sufficiently imminent. With respect to the first contact, the court found that respondent's threat, "I want to beat your motherfucking ass," was sufficiently imminent, explaining that respondent's decision to keep driving towards K's home

demonstrated an intent to further seek out K, which supported the intent of his threat and its imminence. The court noted that respondent verified that he made the statement and that respondent became visibly angry during his trial testimony as he recounted the event. With respect to the statement, "I am coming for you," the trial court found that the statement could only be interpreted as a threat of harm in light of the prior statements and actions of respondent, and thus, it was an unequivocal threat and, in light of the factual history and totality of the circumstances, sufficiently clear and imminent.

The trial court further concluded that both petitioners and B were alarmed by the contacts, explicitly finding that M, K, and B were credible, and that the alarm caused reasonable apprehension on the part of both petitioners. The court noted that that was especially true in light of the history and prior behavior of respondent and the knowledge that respondent typically carried firearms. The court added that K was fully aware of the harm that respondent caused his mother and of respondent's prior threats to kill him. The court explained that the alarm was objectively reasonable considering the clear and credible descriptions of rage by respondent dating back from before the two-year period. Respondent timely appealed, challenging both of the SPOs.

On appeal, respondent asserts that the trial court erred because the qualifying expressive contacts relied upon—which were the same incidents for each case—were insufficient under Oregon law and the non-expressive nature of those contacts would not have caused petitioners reasonable apprehension or alarm for their personal safety. In addition, he argues that the trial court erred because one of the contacts involved an incident between respondent and B, who is not an immediate family or household member of M, and thus that incident cannot qualify as a contact with respect to M.

We begin with the governing law. To obtain an SPO under ORS 30.866, the civil stalking statute, a petitioner must establish by a preponderance of the evidence that: (1) the respondent engaged in at least two unwanted contacts with the petitioner or a member of the petitioner's

immediate family or household within the preceding two years; (2) each contact gave rise to subjective alarm that was objectively reasonable; and (3) the contacts, when considered together, gave rise to objectively reasonable apprehension regarding the petitioner's personal safety or that of a household or family member. ORS 30.866(1); *C. J. R. v. Fleming*, 265 Or App 342, 348-49, 336 P3d 534 (2014).[1] The statute also requires proof that the respondent acted with at least a reckless mental state. ORS 30.866(1)(a); *C. Q. R. v. Wafula*, 305 Or App 344, 353, 471 P3d 786 (2020).

ORS 163.730(3) provides a definition of what qualifies as a contact and includes:

"(a)   Coming into the visual or physical presence of the other person;

"* * * * *

"(e)   Speaking with the other person by any means[.]"[2]

---

[1] ORS 30.866(1) provides, in full:

"(1)   A petitioner may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a respondent if:

"(a)   The respondent intentionally, knowingly or recklessly engages in repeated and unwanted contact with the petitioner or a member of the petitioner's immediate family or household thereby alarming or coercing the petitioner;

"(b)   It is objectively reasonable for a person in the petitioner's situation to have been alarmed or coerced by the contact; and

"(c)   The repeated and unwanted contact causes the petitioner reasonable apprehension regarding the personal safety of the petitioner or a member of the petitioner's immediate family or household."

[2] ORS 163.730 has been amended since the underlying incident in this case. Or Laws 2024, ch 90, § 1. Because the amendments do not affect our analysis, we refer to the current version of the statute in this opinion. ORS 163.730(3) provides, in full:

"(3) 'Contact' includes but is not limited to:

"(a) Coming into the visual or physical presence of the other person;

"(b) Following the other person;

"(c) Waiting outside the home, property, place of work or school of the other person or of a member of that person's family or household;

"(d) Sending or making written or electronic communications in any form to the other person;

"(e) Speaking with the other person by any means;

"(f) Communicating with the other person through a third person;

"(g) Committing a crime against the other person;

When the alleged contacts involve speech, constitutional protections are implicated. *K. R. v. Erazo*, 248 Or App 700, 705, 274 P3d 214 (2012) (noting that "if a 'contact' involves speech, Article I, section 8, of the Oregon Constitution requires proof that it is a threat"). Only statements constituting a "threat" qualify as a contact. *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999) (explaining that, "[i]f the contact in question amounts to communication by speech or writing, only a threat will be sufficient to cause apprehension or fear resulting from the perception of danger, as ORS 163.730 requires" (internal quotation marks omitted)). A "threat" is a communication that creates fear of imminent and serious personal violence, is unequivocal, and is objectively likely to be followed by unlawful action. *Rangel*, 328 Or at 303. An imminent threat is one that is "ready to take place" or "near at hand," but it need not convey a risk of "immediate" harm. *S. L. L. v. MacDonald*, 267 Or App 628, 633, 340 P3d 773 (2014). A threat does not include hyperbole, rhetorical overstatement, or ineffectual expressions of anger. *Rangel*, 328 Or at 303. Speech falling short of a "threat" under *Rangel* cannot independently serve as a qualifying contact, although it may be considered as

---

"(h) Communicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person;

"(i) Communicating with business entities with the intent of affecting some right or interest of the other person;

"(j) Damaging the other person's home, property, place of work or school;

"(k) Delivering directly or through a third person any object to the home, property, place of work or school of the other person;

"(L) Service of process or other legal documents unless the other person is served as provided in ORCP 7 or 9;

"(m) Obtaining, possessing, transferring, creating, uttering or converting to the person's own use the personal identification of the other person;

"(n) Disclosing an image of the other person, whose intimate parts are visible or who is engaged in sexual conduct, without the consent of the other person;

"(o) The use of an electronic service, application, device or other electronic means to obtain, monitor or interfere with the location, communication or activities of the other person, without the consent of the other person; or

"(p) Causing a third person to harass, humiliate or injure the other person by disclosing the other person's name, image or personal information, as that term is defined in ORS 30.835, without the consent of the other person."

contextual evidence for nonexpressive conduct. *M. C. H. v. Milligan*, 208 Or App 229, 236-37, 145 P3d 180 (2006).

In determining whether an expressive contact is an "unequivocal" threat of "serious physical harm," we may look to contextual factors. *M. D. O. v. Desantis*, 302 Or App 751, 761-62, 461 P3d 1066 (2020). We have explained that contacts that may "appear innocuous when viewed in isolation often take on a different character when viewed either in combination or against the backdrop of one party's assaultive behavior towards the other." *L. B. v. Essin*, 170 Or App 509, 518, 12 P3d 1003 (2000), *rev den*, 331 Or 674 (2001).

With that context in mind, we turn to the first contact. Respondent specifically argues that his statement that "I want to beat your motherfucking ass, you motherfucking piece of shit" lacked imminency because respondent and K were in their respective vehicles on a public roadway, neither man got out of his vehicle, and respondent stated that he "wanted" to beat K's "ass," not that he "would" beat K's "ass," and thus the statement was hyperbole that expressed anger and frustration. Respondent asserts that the fact that both men remained in their vehicles supports the conclusion that it was not an unequivocal threat that objectively instilled fear of imminent and personal violence.

As an initial matter, although respondent and K were in their respective vehicles on a public roadway, that fact alone is not dispositive. Indeed, in *M. D. O.*, where the parties were in their respective trucks in a parking lot, we focused on the broader context of that statement beyond their immediate surroundings. 302 Or App at 762-63 (explaining that, although the respondent "might be correct that he would have had to move his car or exit his car to cause injury to [the] petitioner, that does not mean his statement was not a threat of imminent serious harm—*i.e.*, threatening harm that is near at hand" (internal quotation marks omitted)). Importantly, we must consider the entire context of respondent and K's interaction, which includes past physical violence and threats.

Here, K knew that respondent had threatened to kill him twice and had physically harmed his mother. He

also knew that respondent had subjected M to disturbing and persistent communication through multiple channels, including texts and security camera systems, undeterred by requests to stop or the previous temporary restraining order. There is evidence to support that the parties had a highly acrimonious relationship and that any interaction would be unwanted. Further, respondent's statement that he "want[ed] to beat [K]'s motherfucking ass" was accompanied by actions—particularly driving from out of town to look for K, immediately flipping K off, and then continuing to K's house after K left. Against that backdrop, we conclude that there was evidence—including respondent driving approximately an hour and a half to find K, confronting K, and telling K, "I want to beat your motherfucking ass, you motherfucking piece of shit"—from which the trial court could conclude that respondent's threat was objectively likely to be followed by unlawful acts. *See* ORS 163.730(3)(a) (defining contact as including "coming into the visual or physical presence of the other person"); *see also L. B.*, 170 Or App at 518 (noting that what could be an innocuous contact may be viewed differently when viewed in context of the party's behavior toward another); *M. D. O.*, 302 Or App at 762 (concluding that the respondent's statement—"If I don't get you now, I'll get you later"—was a threat of imminent serious harm based on contextual factors including the highly acrimonious relationship between the parties); *S. L. L.*, 267 Or App at 633 (concluding that the respondent's telephonic threats were "imminent" based on contextual factors, such as past domestic violence and violation of a no-contact order); *A. Z. v. Lange*, 336 Or App 652, 656-57, 562 P3d 647 (2024) (explaining that contextual factors, such as physical violence and obsessive conduct, provide meaning to the respondent's message that "it's not gonna end well for [the petitioner] and that he's not gonna stop until he's in jail").

For similar reasons, given the context and history between the parties, we conclude that the alarm was objectively reasonable. Respondent's reliance on *State v. Hejazi*, 323 Or App 752, 524 P3d 534 (2023), is unavailing. In that case, we observed that the defendant and the person to whom he directed the statements were practically strangers and that the facts in that case did not indicate that they had

any relationship aside from the three discrete encounters at issue. *Id.* at 758; s*ee State v. Johnson*, 328 Or App 340, 347, 536 P3d 1029 (2023), *rev den*, 372 Or 588 (2024) (observing that the defendant and the victim in *Hejazi* were "practically strangers and that the facts in that case did not indicate that they had any relationship aside from the three encounters at issue"). Unlike *Hejazi*, however, the parties' previous—and severely strained—relationship, which includes threats and violence, provides support for the trial court's determination that K's alarm was objectively reasonable. Accordingly, we conclude that the trial court did not err in determining that the contact was a qualifying contact.

Turning to the second contact, respondent argues that "I am coming for you" was not an unequivocal threat, that it could have many meanings, and that it did not give rise to any specific temporal indication of imminency. We readily conclude that, based on the totality of the circumstances—including prior threats to kill both petitioners, physical violence, disregard of requests not to contact, including a violation of a previous protective order, and driving an hour and a half looking for K—there is evidence to support that that statement, as the trial court found, could "only be interpreted as a threat of harm" that is near at hand.

We reject respondent's reliance on *J. L. B. v. Braude*, 250 Or App 122, 279 P3d 290 (2012), to support his argument that the situations lacked serious, imminent harm because that case is factually distinguishable. In *J. L. B.*, we reversed a trial court order granting an SPO obtained after the petitioner witnessed the respondent driving past her home more than a dozen times, sometimes slowly, parking by the driveway, and was often seen in the neighborhood. 250 Or App at 125-26, 129-31. In that case, we explained that the respondents "did not enter [the] petitioner's property during those incidents, did not make threatening gestures or comments (indeed, they did not attempt to communicate with [the] petitioner or her neighbors in any way), and did not wait at the end of her driveway for lengthy periods of time." *Id*. at 129-30. That case is factually distinguishable from this situation. Here, respondent drove and parked in K's driveway and yelled at B, "I'm coming for you," while in a

"rage," and there was a known history of death threats and violence.

Respondent's reliance on *M. F. v. Falkenstein*, 236 Or App 445, 236 P3d 798 (2010), to support his argument is similarly unavailing. In that case, we reversed a SPO after concluding that there was

> "no evidence that [the] respondent's actions were explicitly threatening; for example, there was no evidence that [the] respondent made threatening gestures or movements towards [the] petitioner or otherwise exhibited an intent to harm her. Nor was there evidence that any of the acts were implicitly threatening; for example, there was no evidence of prior acts of violence or abuse by respondent."

236 Or App at 453. Here, however, there was evidence that respondent threatened petitioners, and there is evidence of prior acts of violence both before and during the two-year period at issue for the SPOs.

In short, given the evidence of threats and harassment, past violence, past violation of a temporary protective order, and distance that petitioner traveled to find K to threaten him, we conclude that there was evidence from which the trial court could conclude, as it did, that these incidents were qualifying contacts.

In respondent's second main argument, he asserts that the trial court erred in granting M's SPO based an incident between respondent and B, who was neither a member of M's immediate family nor household. At oral argument, respondent acknowledged that this argument was not raised before the trial court; however, he argued that, because he did not know that the trial court would rely on that when it issued the SPO with respect to M, respondent did not have an opportunity to raise the argument before the court.

Generally, an issue not preserved in the trial court will not be considered on appeal. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380, 823 P2d 956 (1991). Preservation is a doctrine rooted in practicality, not technicality. *State v. Skotland*, 372 Or 319, 326, 549 P3d 534 (2024). Requiring an argument to be preserved advances fairness and efficiency by affording the opposing parties and the trial court

a meaningful opportunity to engage with the merits of an argument and potentially avoid error altogether. *Id*.

Here, the contact was alleged in the stalking order petition, the incident was litigated, and there was significant testimony around that contact. Additionally, at the close of the hearing, the trial court requested additional briefing specifically on the issue of qualifying contacts. At no point, however, did respondent alert the trial court or petitioner to the argument advanced on appeal. Accordingly, we conclude the error is not preserved. Further, because respondent does not request plain-error review, we decline to reach the merits.

Affirmed.